[Civ. No. 35911. Second Dist., Div. Four. Oct. 14, 1971.]

WAYNE F. LEWIS et al., Plaintiffs and Respondents, v.
AMERICAN HOIST & DERRICK COMPANY, Defendant,
Cross-defendant and Appellant;
BROWN-BEVIS INDUSTRIAL EQUIPMENT COMPANY,
Defendant, Cross-complainant and Appellant;
CHARLES J. ROUNDS COMPANY, Cross-defendant and Respondent;
ALLIED INSURANCE COMPANY, Intervener, Cross-defendant and
Respondent.

## Counsel

Murchison, Cumming, Baker & Velpmen, Robert M. Schreiber and Ronald R. McQuoid for Defendant, Cross-complainant and Appellant.

Brill, Hunt, DeBuys & Burby and Henry E. Kappler for Defendant, Cross-defendant and Appellant.

Rose, Klein & Marias, Robert B. Steinberg, Barry I. Goldman and Leonard Sacks for Plaintiffs and Respondents.

Hagenbaugh, Murphy & Davies and Ronald L. Katsky for Intervener, Cross-defendant and Respondent.

No appearance for Cross-defendant and Respondent.

## Opinion

**DUNN, J.**—Plaintiffs Wayne Lewis and Harl Fry were employed by Charles J. Rounds Company as a crane operator and pile driver, respectively. On June 28, 1963, they and fellow employees were engaged in constructing a storm drain on South Rexford Drive just north' of West Pico Boulevard in Beverly Hills. Plaintiffs were injured when the boom of a crane they were using collapsed and fell; they filed suit. Their complaint for personal injuries was answered by defendants American Hoist & Derrick Company (herein American), manufacturer of the crane, Brown-Bevis Industrial Equipment Company (herein Brown or Brown-Bevis), local distributor of American equipment, and MacWhyte Company, a manufacturer of wire rope.

Although plaintiffs' complaint, as amended, raised issues of negligence, breaches of warranties and strict liability, plaintiffs abandoned the first two theories and proceeded solely on the theory of strict liability in tort. (*Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57 [27 Cal. Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049].)

Brown-Bevis filed a cross-complaint against Charles J. Rounds Company (Rounds) and Allied Insurance Company (Allied),[1] Rounds' workmen's compensation insurance carrier, whereby it sought to reduce plaintiffs' recoveries of damages, if any, by the amounts of compensation benefits paid

---

[1]Pacific Employers Insurance Company originally was named but Allied Insurance Company was substituted in its place for all proceedings.

to them by Allied; additionally, Brown cross-complained against American, seeking to be indemnified by American from plaintiffs' claims for damages. Thereafter, Allied filed a complaint-in-intervention against American and Brown-Bevis seeking recovery of compensation benefits paid. Ultimately, it, too, based its claim for damages solely upon the theory of strict liability in tort.

The actions by plaintiffs and Allied were severed from the cross-complaint and tried by a jury, resulting in separate verdicts for the intervener and for plaintiffs against American and Brown.[2] Brown's cross-complaint thereafter was tried by the court on the basis of the evidence received at the first trial, plus additional evidence. A judgment therein was entered in favor of American and the other cross-defendants and against cross-complainant Brown.

Brown and American both appeal from the judgment favoring plaintiffs and Allied; Brown also appeals from the adverse judgment on its cross-complaint.

### I. *American's Appeal From the Judgment for Plaintiffs*

### A. *Insufficiency of the Evidence*

■ In its appeal, American first contends that the evidence was insufficient to sustain the judgment against it. This requires a summary of the pertinent evidence, ignoring conflicting evidence unfavorable to the judgment and indulging all reasonable inferences favoring it. (*Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].)

The evidence discloses that Howard Griffin became American's regional sales manager in 1959. In the course of his duties he called regularly upon Rounds' personnel and, over a period of several years, discussed with them Rounds' prospective purchase of the 75-ton crane involved in this lawsuit. The crane had a 70-foot boom and was mobile, being mounted on a Pierce "wagon," or carrier, rather than being truck or crawler-mounted.

Brown-Bevis was the exclusive distributor of American's products in the Los Angeles area but, because Griffin had greater familiarity with his employer's products, he personally negotiated the sale of the crane to Rounds. Brown personnel made "a call or two" with Griffin regarding the sale and Brown handled the "paper work" for the order but did nothing further prior to the sale.

After the sale was made, the crane was delivered by American in March 1963 to Brown's yard in Los Angeles where it was partially assembled by

---

[2]MacWhyte was granted a nonsuit and is not involved in these appeals.

Brown personnel, then transferred to Rounds' field yard where assembly was completed by Brown and Rounds' workmen. Rounds used it initially to lift cement pipe, thereafter moving it to the Beverly Hills storm drain job where Rounds had dug a trench in which to construct a storm drain. Walls of the trench were shored by sinking "H-beam" pilings vertically in the ground along the trench walls. After the cement conduit of the storm drain was poured and hardened, the trench was back-filled with dirt and the crane was then used to pull out the pilings.

Plaintiff Lewis started working for Rounds about April 1, 1963. He was an experienced crane operator and on his first day of employment had been sent to the Brown premises to familiarize himself with the new crane and its controls; thereafter, at Rounds' field yard, he assisted in getting the crane assembled and rigged with cables for operation. He was the only one to operate the crane. He first operated it to lift the cement pipe and thereafter to pull the pilings at the Beverly Hills job.

There was evidence that the term "tipping capacity" relates to the load a crane can lift before its wheels, to the rear of the boom, start to raise from the ground. An operator becomes aware of the "tipping point" by experience and feel—"by the seat of the pants." It means the crane will lift no more and if you "continue to raise the back end up" it would "turn the crane over, I guess. I never have tried it."

The crane was equipped with a capacity, or "rating," chart which showed the lifting capacity of the crane when its boom was extended to various lengths and set at various angles with the ground, both with and without the crane's outriggers being extended to attain further stability. When a crane is lifting unknown weights, however, an operator cannot use the chart to determine lifting capacity of the crane in any particular attitude and there was evidence he ordinarily relies on "tipping capacity." "You don't know what anything weighs . . . the safety factor . . . on your crane is that it will tip before it will come unglued." In pulling pilings, an operator does not know how much resistance the earth will present to the removal of a piling embedded in it and therefore he relies on the crane's "tip condition." There was evidence that this method of crane operation is customary in the trade.

Griffin was aware that Rounds constructed storm drains and planned to use the crane to withdraw pilings embedded in the ground. He had seen cranes operated and had, himself, been a crane operator; he knew when he negotiated sale of the crane that its operator would rely on the crane's tipping capacity in removing pilings embedded in the ground, and that the operator would detect tipping capacity by the "seat-of-the-pants" approach.

He testified "that all boom-type mobile cranes are designed and manufactured with a tipping capacity."

Prior to the accident, Lewis and his crew had encountered several pilings that were difficult to remove. Some of them could be removed by use of a "pulling leg," an A-frame device that gave greater pulling power. To operate this, the hoist cable of the crane was removed from the boom and run from the crane's hoist drum to the top of the A-frame, whence it descended and was attached to the piling to be removed. The pulling leg was held upright by another cable run from the crane boom, enabling the crane to stabilize the pulling leg and to lift and reposition it as required. This pulling leg weighed approximately three to four tons. Some pilings could not be removed at all. When this occurred, the crew would dig around a piling and cut off its top portion, leaving the remainder in the ground.

At the time of the accident an attempt was being made to remove a piling with the crane. An unsuccessful attempt to remove it had been made on an earlier occasion, but the presence of overhead power and telephone lines had forced use of a lower boom angle, thus diminishing the crane's lifting ability; also the position of the crane at that time had put most of the load on one outrigger, causing additional loss of the crane's lifting power and of its stability. The pilings being pulled in this area were 25-30 feet long and weighed 1,200-1,500 pounds.

When the crane returned to try again, it was positioned somewhat differently than before and all four outriggers were extended and set. Lewis was then working in a five-man crew, the other four men being the oiler on the crane, the foreman and the two "pile drivers," one of whom was plaintiff Harl Fry. Pile drivers handle the pilings and rig the lines needed to remove them.

Lewis dropped the crane's hoist line and hook. After the pile drivers connected the "gripper" (a device used to grip the piling) to the hook and attached the gripper to the piling, the foreman gave Lewis a signal to begin hoisting, which he did until given a signal to stop. The foreman then signaled him to raise the boom, or "boom up," so that the line would hang straight down, or plumb, above the piling. Lewis raised the boom until he felt "I had probably sufficient load for the pile to come loose. . . . I stopped of my own accord. . . . It was close to capacity." He held the boom in that position for perhaps four to five minutes, holding a "strain" on the piling while the pile drivers struck its sides with sledge hammers hoping to jar it loose from the ground—a normal procedure. The piling came up a little and the crane took a "little more strain on it."

At no time did the crane's wheels start to come off the ground or did

its undercarriage move. Its tipping point had not been reached, but "I didn't think I was very far from it." After the four-to-five-minute interval, Lewis received another signal to raise the boom. He started to boom up. Almost immediately a loud noise was heard. The wheels of the crane were still on the ground at that time. Lewis saw something coming at him and "the next thing I know I was on the ground." A "pendant" on the left side of the boom had broken and the boom and its suspension system fell and injured the two plaintiffs. At the time this occurred, the 70-foot boom of the crane had formed an angle of about 30° with the ground.

"Pendant lines" run from a frame called a "pendant arbor," located near the boom's base, and extend along the boom to its tip. A pendant line is attached to each side of a boom. It is formed of individual "pendants" attached together at their ends. These pendants are made of wire rope with swaged fittings, called "jewels," at each end so that pendants of various lengths can be joined together to make a single pendant line. Since a boom is composed of removable sections which are either 10 or 20 feet long, thus permitting a boom to be shortened or made longer, each section is accompanied by two pendants of corresponding length, one for each side.

American's design of the pendants for the 75-ton crane called for the use of wire rope 1¼″ in diameter. However, the 10-foot section of pendant which broke on the left side of the boom, and its accompanying section on the right side, was only 1⅛″ in diameter. Ordinarily, 1¼″ and 1⅛″ pendants would not be interchangeable since their end connections, or jewels, would not fit each other. Additionally, a 1¼″ wire rope will not fit into a 1⅛″ jewel. In our case, however, MacWhyte Company, after manufacturing the wire rope, had swaged it to pendant connections furnished by American and American had modified the 1⅛″ connection by boring it out to accommodate 1¼″ wire rope; this made pendants with two different rope diameters interchangeable, since each had a 1⅛″ connection. American's purchase order to MacWhyte specified the connection and wire rope size desired and MacWhyte merely furnished it as ordered.

When the crane was delivered by American to Brown some of the boom sections, including the pendants, were in a box. The box was transferred to Rounds' yard where 40-60 feet of the boom was assembled, using parts and pendants taken from the box. It is reasonably inferable from the record that the 1⅛″ pendant which broke was among those delivered. The break occurred in the rope part of the pendant, two feet or more from the nearest jewel.

Res ipsa loquitur has no application to strict liability in tort. (*Tresham* v. *Ford Motor Co.* (1969) 275 Cal.App.2d 403 [79 Cal.Rptr. 883]; *McCurter* v. *Norton Co.* (1968) 263 Cal.App.2d 402, 407, 408 [69

Cal.Rptr. 493].) ■■■ From this, appellant American argues that there is no evidence from which to find that the furnishing of the 1⅛″ pendant infers the presence of a "defect." Plaintiffs called no expert witnesses to express an opinion on this, or any other point respecting liability.

We do not accept appellant's argument. Thus, the crane was designed to use 1¼″ pendants but two 1⅛″ pendants were mistakenly furnished. While no defect in the "design" of the crane is shown, its shortcoming lies in American's failure to comply with its own design requirements, resulting in a defect of assembly or manufacture.

American argues there is no evidence that it furnished the undersized pendants. However, a contrary inference may be drawn from the record, as we have previously indicated. Accordingly, the evidence was sufficient to establish that the crane was defective at the time it was delivered by American.

Next, American contends: (1) the evidence shows without dispute that the crane was being used for a purpose not intended by American, as manufacturer, and (2) there is no evidence to show a causal relationship between the use of 1⅛″ rope and the accident, or, put another way, no evidence to show that use of 1¼″ wire rope would have prevented the accident.

■■■ The first point rests principally on the argument that the crane was designed, and intended to be used, only to lift weights in accordance with the capacity chart; to do otherwise would be to use it in a way not intended by American. American's argument thus assumes that its intended use of the crane must be determined solely from the rating chart. We disagree, as its intention can be read from other factors, as well.

Rebutting American's contention is the fact that American, through its regional sales manager, Griffin, was familiar with Rounds' intended operations and also was familiar with crane operators' allegedly customary techniques. Griffin testified in response to questions: "Q. . . . it is your assumption that attempting to dislodge tight piling that wouldn't budge or come loose shouldn't harm the crane; correct? A. This is correct. Q. Because the crane would attain tip condition before a failure would occur? A. Yes." American knew that in pulling embedded pilings from the ground an unknown weight, or resistance, would be encountered and that a crane operator frequently does not use a chart under such circumstances; instead, he relies upon tipping capacity, which he determines "by the seat of his pants." This, according to Griffin, was customary. To say that American sold the crane but did not intend such use is to ignore the evidence.

American argues that use of the crane as it intended, not a use intended by the purchaser, is the only pertinent factor, appellant contending that the mere fact a manufacturer may be aware of a purchaser's intended misuse of its product does not establish that the manufacturer also intended such misuse. We agree with the latter contention. But here the purchaser did not merely walk into a distributor's salesroom and say, "I'll take that"; rather, *Rounds dealt directly with the manufacturer* and negotiations went on for a considerable period, with Rounds' requirements and intended use of the crane fully explored.

We conclude there is evidence that American sold the crane reasonably foreseeing and intending that adherence to chart capacities might be impossible where unknown weights are involved and when "seat-of-the-pants" practices are customary.

■ Appellant's argument that there was no proof of proximate cause (*Greenman* v. *Yuba Power Products, Inc., supra*, 59 Cal.2d at p. 64) rests on the claim that plaintiffs' evidence: (a) shows no more than that a sound 1⅛" wire rope broke and that the crane's design called for the use of a 1¼" rope; (b) there was no evidence that use of the proper-sized rope would have prevented the accident; (c) the mere fact the wire rope broke does not establish that it broke because it was smaller than planned; (d) hence, no causal relationship is shown. Appellant points to the opinion of an expert witness, called by appellant, who testified he believed the crane was lifting 34,500 pounds when the pendant broke and that the capacity chart fixed 19,600 pounds as the crane's maximum allowable load when its boom was at the angle and attitude it occupied at the time of the accident.

In making this argument, appellant ignores the fact the pendant failed before the tipping capacity of the crane was reached. Thus, as stated by one witness, "You don't know what anything weighs . . . the safety factor . . . on your crane is that it will tip before it will come unglued." Breaking of the 1⅛" pendant before tipping capacity was reached thus supports an inference that a proximate cause of the accident was the use of this pendant. ■ As stated in *Elmore* v. *American Motors Corp.* (1969) 70 Cal.2d 578, 583-584 [75 Cal.Rptr. 652, 451 P.2d 84]: ". . . a plaintiff is entitled to establish the existence of the defect and the defendants' responsibility for it by circumstantial evidence. . . . No reason appears why the same rule should not apply where the plaintiff is seeking to prove that the defect caused his injuries." (Also see: *Tresham* v. *Ford Motor Co., supra*, 275 Cal.App.2d at p. 407.)

## B. *Exclusion of Evidence*

■ American contends the court prejudicially erred in excluding evidence. American had subpenaed an accident investigation report prepared by a safety engineer employed in the State Division of Industrial Safety. The report was brought to court by its custodian who left the report and departed. Attached to it was a sheet headed "Property of Department of Industrial Relations, DIVISION OF INDUSTRIAL SAFETY . . . CONFIDENTIAL INFORMATION." Following the heading there ensued a mimeographed quotation of Labor Code section 6319,[3] a partial quotation from a purported opinion of the Attorney General dated January 13, 1948[4] and a partial quotation of an opinion purportedly issued by the Industrial Accident Commission, holding that accident investigation reports are "inadmissible as evidence in proceedings before them." One reading this sheet might well conclude that, by this device, the Division of Industrial Safety was attempting to assert that the report was privileged under Evidence Code section 1040.[5]

American also had subpenaed the safety engineer who made the report. He was interrogated by court and counsel with the jury absent, the court permitting the witness to read the first page ("face sheet") of his report dated July 23, 1963. Having done so, the witness testified he recalled that he had investigated the accident, "more than several days" after it had occurred on June 28, 1963. He had seen the area where the accident happened but, at that time, the crane had been removed and "everything had changed." He never inspected the crane and "my information is purely hearsay" and was obtained "from talking to other people who were concerned in the case."

The court inspected the report, concluded it was confidential and precluded counsel from perusing it, also ruling that it could not be used in examining the witness. The witness was then called to testify in open court. He testified that he recalled investigating the accident but that testifying to any details would require that he first refresh his memory by review-

---

[3]At the time of this trial, Labor Code section 6319, read: "No officer or employee of the division shall divulge to any person not connected with the administration of this part any confidential information concerning the failure to keep any place of employment safe or concerning the violation of any order, rule, or regulation issued by the board or division. Violation of this section is a misdemeanor." The section was modified effective in 1970, but the modification is inapplicable to our case.

[4]No other reference is given. The opinion is not published in the collected Opinions of the Attorney General.

[5]Whether such a report was or still is privileged, and whether this manner of asserting and establishing any privilege is sufficient, are matters we need not decide, although we observe all are open to some question.

ing his report. On objection by respondents, the court then ruled that the report could not be so used. No more questions were asked of the witness.

It well may be that the court's ruling as to confidentiality was error. This we do not decide for, if error, it was not prejudicial. On appellant's invitation we have read the report. On its face it shows itself to be based exclusively upon information furnished by three men, not one of whom is shown, or known, to be a witness to any fact pertinent to the accident; no facts are reported; the report states only the engineer's tentative opinion as to the cause of the accident, also stating his recommendations for future practices in employment of the crane.

While an opinion may, under Evidence Code section 801, be based upon information which is inadmissible hearsay, still the information must be "of a type that reasonably may be relied upon by an expert in forming an opinion. . . ." (Evid. Code, § 801, subd. (b).) Nowhere in the report are any facts surrounding the accident stated or is anything reported to support the opinions mentioned. ■ Evidence Code section 801, subdivision (b) permits an expert to base his opinion on "reliable matter" (Law Revision Commission comment to Evid. Code, § 801) whether or not admissible, but not upon unreliable matter. A court "may, and upon objection shall, exclude testimony in the form of an opinion that is based in whole or in significant part on matter that is not a proper basis for such an opinion . . . ." (Evid. Code, § 803.)

■ Having ourselves reviewed the report as requested, we find nothing in it that, if reviewed by the witness, would have refreshed his memory as to admissible matter. Accordingly, if the court erroneously ruled the report was confidential, such ruling is not shown to have resulted in a miscarriage of justice (Cal. Const., art. VI, § 13, i.e., to have been prejudicial.

## C. *Error in Instruction*

American's briefs adopt from Brown's briefs any additional arguments there made which are pertinent to a reversal of plaintiffs' judgment against American. Only one such appears.

■ Appellant American submitted an instruction[6] which the trial court modified and gave as follows: "If you find that a party to this action violated either Section 3999 or Section 4010 of the Safety Orders just read

---

[6]As submitted, the instruction read: "If you find that a party to this action violated either Section 3999 or Section 4010 of the Safety Orders just read to you, you will find that such violation constituted failure on the part of said party to use the crane in question for the purpose for which it was designed and intended to be used."

to you,[7] [t]his could be a basis upon which you might determine that the crane was not being used in the manner and for the purpose for which it was designed and intended to be used." It is contended the instruction should have been read as submitted. (See fn. 6.)

Admittedly, the instruction was intended to paraphrase BAJI (4th ed.) Instruction No. 149 Rev. or 149A (both now No. 3.45 in BAJI, 5th ed.) dealing with the subject of negligence based upon violation of a statute, ordinance or safety order. Appellant seems to argue the instruction was proper as proposed, since violation of the safety orders would constitute contributory negligence on the part of the plaintiffs. ■ However, the form of contributory negligence which constitutes a defense to strict liability is limited to that "which consists in voluntarily and unreasonably proceeding to encounter a known danger, and commonly passes under the name of assumption of risk." (Rest.2d Torts, § 402A, com. n; *Ruiz v. Minnesota Mining & Mfg. Co.* (1971) 15 Cal.App.3d 462, 470 [93 Cal.Rptr. 270]; *Barth v. B. F. Goodrich Tire Co.* (1968) 265 Cal.App. 2d 228, 243 [71 Cal.Rptr. 306].) ■ There was no evidence bringing any plaintiff within the principle thus expressed.

Nor would proof of use of the crane in violation of a safety order lead inevitably to the conclusion that the crane was being used in a fashion contrary to that intended; as we have shown, American had full knowledge of the way in which Rounds intended to employ the crane and the manner in which it would be operated. American, itself, contemplated such usage. Accordingly, the instruction submitted was too broad in light of the evidence relating to American's liability, and it was not error to refuse to give it as submitted but to give it as modified.

### D. *The Workmen's Compensation Intervener, Allied, Cannot Recover on a Strict Liability Theory*

■ Finally, American contends the trial court erred when it permitted the intervening compensation insurance carrier, Allied, to go to the jury under the theory of strict liability in tort. As we read its briefs, American's

---

[7]The court had read safety orders:

"Section 3999—Size of Load. A crane, derrick, or hoist shall not be loaded beyond the rated capacity or safe working load, whichever is smaller."

"Section 4010—Parts Subject to Wear. The employer shall require that wire ropes, bearings, gears, friction clutches, chain drives and other parts subject to wear, be inspected at adequate intervals and the unsafe conditions corrected. The Division may require properly dated, detailed reports of such inspection to be made in places of employment where there is doubt as to the proper supervision over safe maintenance of hoisting equipment. The intervals between the inspections shall be short enough to enable the employer to be reasonably certain that the crane, hoist or derrick will never be operated when in an unsafe condition."

contention is two-fold: (1) an employer[8] who is at fault (negligent) should not be entitled to recover from one who is made liable without fault (negligence) pursuant to strict liability theories, and (2) in any event, a compensation insurer's loss is a "commercial" loss and not recoverable under strict liability, according to the rule of *Seely* v. *White Motor Co.* (1965) 63 Cal.2d 9 [45 Cal.Rptr. 17, 403 P.2d 145].

First, an employer's obligation to pay compensation benefits to an employee may arise without negligence on the employer's part. (Lab. Code, § 3600.) Thus, the fact an employer (insurer) has paid, or is obligated to pay, benefits to an employee does not establish any fault. We are given no authority and we see no reason why an employer cannot proceed against a third party on the basis that such party also is liable without fault (i.e., negligence). Under such a theory, ordinary contributory negligence of the injured party is no defense to the claims he asserts (*Barth* v. *B. F. Goodrich Tire Co., supra,* 265 Cal.App.2d 228) and contributory negligence of his employer should be no defense against the employer's claims. (See dissent, *Ruiz* v. *Minnesota Mining & Mfg. Co., supra,* 15 Cal.App.3d at pp. 471-473.)

Second, the damage recoverable by the employer is not that type of "commercial" loss prohibited under *Seely* v. *White Motor Co., supra,* 63 Cal.2d 9. In that case loss of profit, or "economic expectations," was held not recoverable by a primary tortfeasee proceeding under the theory of strict liability. Personal injuries and property damage, however, were not excluded. Thus, in a personal injury case, the injured plaintiff can recover for loss of earning capacity, lost earnings and medical expenses relating to his disability and injuries. So far as we can see, an employer obliged to pay medical expenses and disability benefits should likewise be able to recover them. We are cited to no contrary authority.

The judgment for plaintiffs and plaintiff-in-intervention must be affirmed as against American.

## II. *Brown's Appeal From the Judgment for Plaintiffs and Plaintiff-in-Intervention*

On its own motion, the trial court instructed the jury that: "if . . . there was a defect and . . . that defect was created in the manufacture or design of the crane . . . while it was in the hands of American . . . then Brown-Bevis . . . under the law is also liable." This was an extemporaneous, oral embellishment which the court added to its instruction given in the language of BAJI No. 53, and immediately following

---

[8]"Employer" includes insurer under Labor Code section 3850. Also, a compensation insurer is subrogated to an employer's rights. (Ins. Code, § 11662.)

it. Brown-Bevis contends this was prejudicial error in that, under the evidence, it was entitled to separate consideration.

BAJI instruction No. 53, given on request of both defendants, had told the jury that each defendant is entitled to a separate defense and if one is liable the other is not necessarily also liable. Since it would be impossible to determine which of these two instructions the jury followed, reversible error could result if the first instruction was erroneous. (*Sebrell* v. *Los Angeles Ry. Corp.* (1948) 31 Cal.2d 813, 817-818 [192 P.2d 898]; *Starr* v. *Los Angeles Ry. Corp.* (1921) 187 Cal. 270, 280 [201 P. 599]; *Lewis* v. *Franklin* (1958) 161 Cal.App.2d 177, 185 [326 P.2d 625].)

Brown reasons there was evidence that it did not know, and reasonably could not have anticipated, the true purpose for which the crane "was designed and intended [by American] to be used" as required under California cases dealing with the doctrine of strict liability in tort (*Thomas* v. *General Motors Corp.* (1970) 13 Cal.App.3d 81, 90-92 [91 Cal.Rptr. 301]; *Johnson* v. *Standard Brands Paint Co.* (1969) 274 Cal.App.2d 331, 340-341 [79 Cal.Rptr. 194]; *Oakes* v. *E. I. Du Pont de Nemours & Co., Inc.* (1969) 272 Cal.App.2d 645, 649 [77 Cal.Rptr. 709]) for which reason it was entitled to have its liability, if any, separately judged.

 A seller, as well as a manufacturer, may be held strictly liable in tort for a defect in the article sold when the evidence establishes that the defect in the product made it unreasonably dangerous and unsafe for the general purpose for which it was designed and intended to be used. The intended use which should be foreseen by the seller, as well as that foreseeable by the manufacturer, is material. Thus, in a suit brought solely against a retailer, the court said: "The ultimate test is whether the article was being used in a way which the seller should have reasonably anticipated." (*Johnson* v. *Standard Brands Paint Co., supra,* 274 Cal.App.2d at p. 340.) Ordinarily, it is inferable from the evidence that a retail seller is aware of the purpose for which a product sold was "designed and intended to be used."
 But here, Brown contends, no such inference drawn from the evidence is either conclusive or undisputed and the jury should have been left to determine the fact. We therefore examine the record.

First, we dispose of one preliminary point. Brown argues that it was not a "seller" of the crane, only accomplishing necessary paper work, the "sale" being negotiated and consummated by American. Such a distinction is here irrelevant in the light of the evidence. (*Barth* v. *B. F. Goodrich Tire Co., supra,* 265 Cal.App.2d at pp. 250-254; and see same title (1971) 15 Cal. App.3d 137, 139-140 [92 Cal.Rptr. 809].)

The evidence showed Howard Griffin to be employed by American but not by Brown. Accordingly, Brown was not privy to American's knowledge of the manner in which Rounds would use the crane. The reasonable expectancies of Brown must be learned from other evidence.

When the crane parts were delivered unassembled to Brown, they were accompanied by a capacity chart showing what weights the crane could be expected to lift with its boom in varying positions. Also accompanying the parts was an Operator's Instruction Manual which contained this warning: "Do not exceed the rated capacity of the machine." This printed matter indicated to Brown that the manufacturer expected the crane to be used only to lift loads as specified in the chart. Such belief would be fortified by the order of the California Division of Industrial Safety requiring compliance with chart capacities, section 3999 of its General Industry Safety Orders providing: "A crane, derrick, or hoist shall not be loaded beyond the rated capacity . . . ." (See fn. 7.)

The evidence relating to Brown's reasonable expectancies *before* the sale, showed its understanding that Rounds' employees would comply with the crane's charted capacities and, where impossible, that they would *not* indulge in seat-of-the-pants operations. There is an available device, like a scale, which can be attached to the boom line and which "will give this weight that you're picking up." The only employee of Brown called to give evidence on the point testified that most crane operators rely on the capacity chart when lifting a known load. Although it is common for operators to rely on a sense of feel, or the seat-of-the-pants, to determine when a crane lifting an unknown load is exceeding its capacity, that method is not considered good practice. Crane manufacturers teach that it is not approved and is not to be done. This evidence not only contradicted evidence produced by plaintiffs, but also tended to establish existence of an accepted contrary custom, factually distinguishing Brown's position from that of American.

There was evidence that *after* the crane was sold, delivered to and used by Rounds, but *before* the accident, a Brown employee, sent to make repairs, observed how Rounds was using the crane. ■■■ Under the precepts of strict liability it is the information available to the retail seller at the time of sale, however, that is relevant to determining if he reasonably should have anticipated some particular manner of use of the product sold. Knowledge of a different manner of use, acquired after a sale, is not relevant. Although so-called "products liability" may be based upon theories of negligence, breach of warranty or strict liability in tort we deal here only with the latter doctrine.

The foregoing evidence tended to establish that Rounds' employees did not use the crane in the manner which Brown intended or reasonably could anticipate. Use of the crane in the manner Brown believed it would be used might not, under the evidence, have resulted in an accident.

The rule has been stated this way (Rest.2d Torts, p. 351, § 402A, com. h): "A product is not in a defective condition when it is safe for normal handling . . . ."

For the reasons stated, we conclude the instruction given was prejudicially erroneous, as it deprived Brown of the jury's determination of a factual issue material to its liability; the judgment against Brown-Bevis must be reversed. This conclusion makes it unnecessary to consider Brown's other arguments against the judgment favoring plaintiffs, or its arguments for reversal of the adverse judgment on its cross-complaint.

The judgment for plaintiffs Lewis, Fry and Allied, the plaintiff-in-intervention, is affirmed as against American and is reversed as against Brown. Brown's appeal from the adverse judgment on its cross-complaint is dismissed as now being moot. Should the outcome of any future trial require it, Brown's right to pursue its cross-complaint for indemnity is preserved. Brown is to recover its costs; plaintiffs and the intervener are to have costs.

Jefferson, J., concurred.

**FILES, P. J.,** Concurring and Dissenting.—I would affirm the entire judgment.

In this case of first impression the majority holds that the retailer (Brown) may be excused upon the ground that it was ignorant of the use for which the crane was intended, as understood by both the manufacturer and the user.

It is important to remember that this kind of liability is not based upon fault. The retailer may be, and usually is, wholly innocent of any fault or wrongdoing. In *Vandermark* v. *Ford Motor Co.* (1964) 61 Cal.2d 256, 262 [37 Cal.Rptr. 896, 391 P.2d 168], and again in *Elmore* v. *American Motors Corp.* (1969) 70 Cal.2d 578, 587 [75 Cal.Rptr. 652, 451 P.2d 84], the Supreme Court stated the reasons for holding the retailer strictly liable in a case of this kind. The majority decision in this case cannot be reconciled with that reasoning.

The explanations of strict liability in the Restatement, and in the BAJI instructions, *do not recognize any separate retailer's defense of the kind*

asserted here. Both authorities explain the defective condition of the product in terms of the expectation of the user, not the knowledge or intent of the seller.

Restatement Second of Torts section 402A, comment *g*, states: "The rule stated in this Section applies only where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him."

BAJI (5th ed. 1969) Nos. 9.00 and 9.01 use this language: "An article is unreasonably dangerous if it is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics."

The majority opinion seems to claim support from the sentence in *Johnson* v. *Standard Brands Paint Co.* (1969) 274 Cal.App.2d 331, 340 [79 Cal.Rptr. 194], which says, "The ultimate test is whether the article was being used in a way which the seller should have reasonably anticipated." Assuming that that dictum is a correct statement of law, it does not support the decision here. In the case at bench the retailer should have anticipated that the crane would be used for the purpose which was both the intention of the manufacturer and the expectation of the user, even though the retailer may have been unaware of what that purpose was. The verdict of the jury in favor of plaintiff against the manufacturer necessarily includes a finding that the crane was unsafe for the use which they intended. That finding necessarily results in liability upon the retailer.