[No. B010837. Second Dist., Div. Two. Feb. 26, 1987.]

ALISON KIMBERLY PIETRONE, Plaintiff and Appellant, v. AMERICAN HONDA MOTOR COMPANY, INC., Defendant and Appellant.

COUNSEL

Weldon Diggs and Linda M. Wilde for Plaintiff and Appellant.

Somers, Hall & Verrastro, Somers, Hall, Verrastro & Kern, Gaetano J. Verrastro, Rene J. Kern, Jr., Greines, Martin, Stein & Richland, Kent L. Richland, Barbara W. Ravitz and Hillsinger & Castanzo for Defendant and Appellant.

OPINION

**GATES, J.**—Defendant American Honda Motor Company, Inc., appeals from the judgment entered pursuant to a jury verdict in favor of plaintiff Alison Pietrone. It contends: "I. Because there was no evidence from which the jury could infer that the motorcycle performed less safely than the reasonable consumer could expect and no evidence that the motorcycle's design caused the injury, plaintiff failed to bear her burden of proving design defect under *Barker* v. *Lull* [*Engineering Co.* (1978) 20 Cal.3d 413 ]. II. Plaintiff's counsel impermissibly argued the existence of alternative motorcycle wheel designs in closing argument despite the absence of any evidence of such designs. This argument allowed the jury to assume, without supporting evidence, such designs would have prevented the injury and to consider the 'benefits' of such designs without their 'risks.' "[1]

Plaintiff presented evidence that she was a passenger on her husband's 1974 Honda CB 450 motorcycle on the afternoon of April 26, 1979. As they entered the intersection of Towne Avenue and Arrow Highway in the City of Pomona the driver of an oncoming automobile began a U-turn. Her husband moved to the right in an unsuccessful attempt to avoid the vehicle. The auto's bumper struck the lower portion of plaintiff's left leg, breaking it.

This impact was so slight it merely created a "wobbling sensation" in the motorcycle rather than causing it to overturn. Nonetheless, plaintiff's now unstable leg came into contact with the exposed spokes of its rear wheel behind the shock absorber, but "[n]ot very long, because it came out, and while it was coming out it was rotating." As it rotated two full revolutions,

---

[1]Plaintiff filed a cross-appeal as a protective measure in the event of a reversal or modification of the judgment. It was not pursued, however, and has become moot in light of our conclusion that appellant's contentions must be rejected. (See *Hitchcock Transportation Co.* v. *Industrial Welfare Com.* (1980) 27 Cal.3d 736, 738, fn. 1 [166 Cal.Rptr. 357, 613 P.2d 605]; *Nichols* v. *Great American Ins. Companies* (1985) 169 Cal.App.3d 766, 771 [215 Cal.Rptr. 216]; *Brink* v. *Brink* (1984) 155 Cal.App.3d 218, 223, fn. 5 [202 Cal.Rptr. 57].)

it "was also moving out and forward." As it did so her foot "caught the shock absorber, which brought it back in again," lodging it tightly into the equally open area located in front of the shock absorber and above the chain guard.

So powerful were the forces that had been exerted upon plaintiff's foot, she was required to sit, helplessly trapped, for many agonizing minutes. In fact, she was freed only after firemen arrived armed with an instrument known as the "jaws of life" with which they were able to cut away the shock absorber. As a result of her experience, it was necessary for this 21-year-old plaintiff to undergo a below-the-knee amputation of her leg.

After presenting the foregoing evidence, but before formally resting, counsel for plaintiff advised the court it was his "understanding of the law, as it exists now in product liability cases, that it is the responsibility of a plaintiff to meet her burden of proof that she present a prima facie case. [¶] That ... a design feature, and in this case that would be the open, exposed, rotating wheel of this motorcycle, was a proximate cause of her injury. [¶] Having established a prima facie case to that extent, ... the burden of proof then shifts to the defendant" who "must now prove and produce evidence that the benefit of this design feature outweighs the risk of injury, as has been presented by the plaintiff." Counsel expressed his belief that plaintiff had met this burden and sought the court's concurrence. He also informed the court that he had additional witnesses, specifically engineers, who could be called to defend "against whatever evidence the defendants present on their burden of proof."

The court declined to make an "anticipatory" ruling, but did indicate that in considering motions the defense might make, it "would see no prejudice to the defense to reopen in the event that [plaintiff] left something out which [the court] deem[ed] critical." Plaintiff responded, "And I will rest, based upon that."

When proceedings commenced following a four-day recess, Honda's counsel opined that in his view plaintiff had failed to prove her case. He announced that "rather than making a motion for a non-suit at this point in time, the defendant will rest at this point of time without producing any additional evidence, other than that which has been produced on cross-examination of the witnesses called by plaintiff and will move this court for a directed verdict." He additionally advised the court, "one of the reasons that we have decided to rest, rather than move for non-suit, was the fact that there has been no expert testimony that would indicate any way, any method, that this motorcycle could have been designed, in order to prevent the unusual type of injury that occurred in this particular case."

Plaintiff's counsel then requested permission to reopen in the event the court granted defendant's motion, reiterating "for the record" that he had "additional evidence" in the form of admissions by Honda's own expert "as to the alternative designs that are available . . . ." This evidence was never produced since the trial court determined plaintiff had presented sufficient evidence to submit the design issue to the jury. Even after this adverse ruling, Honda made no effort to present a defense.

In *Barker* v. *Lull Engineering Co.* (1978) 20 Cal.3d 413 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1], our highest court established that "a product may be found defective in design, so as to subject a manufacturer to strict liability for resulting injuries, under either of two alternative tests. First, a product may be found defective in design if the plaintiff establishes that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner. Second, a product may alternatively be found defective in design if the plaintiff demonstrates that the product's design proximately caused his injury and the defendant fails to establish, in light of the relevant factors [e.g., "the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design" (*id.* at p. 431)], that, on balance, the benefits of the challenged design outweigh the risk of danger inherent in such design." (*Id.* at p. 432.)

In the instant case the evidence conclusively established that a design feature of Honda's product—the open, exposed, rotating rear wheel in close proximity to the passenger's foot pegs—was a proximate cause of plaintiff's injury. Without more, the burden then shifted to Honda to justify its adoption and utilization of that particular design. (See BAJI No. 2.60 as modified in accordance with BAJI No. 9.00.5 (7th ed. 1986).) Further, even were it to be assumed that plaintiff's burden under *Barker* exceeded such a showing and required that she demonstrate the existence of some alternative design which would have prevented or lessened her injury, this burden was met by the jury's mere inspection of the photographs introduced into evidence. That is to say, no more than a cursory examination of this machine's configuration makes apparent both the danger of its design and potential solutions thereto.[2]

Given that such alternative designs were so self-evident as to obviate the need to present express testimony, expert or otherwise, on the subject,

---

[2] Upon our own motion we ordered the exhibits introduced below transmitted to this court for review. (Cal. Rules of Court, rule 12(a).)

it is equally clear counsel for plaintiff did not commit misconduct by mentioning during argument that items which "would avoid contact" such as saddlebags, luggage racks, fairings, shields, etc., could be so placed as to partially enclose the motorcycle's rotating rear wheel. The existence of such devices on other models is a matter of general knowledge and their potential effectiveness in preventing the sort of accident which occurred here is patent.

■ Since Honda, apparently for unknown tactical reasons it regarded as sound, elected to make absolutely no effort "to establish that because of the complexity of, and trade-offs implicit in, the design process" (*Barker* v. *Lull Engineering Co., supra,* 20 Cal.3d at p. 432), the risk of danger inherent in the particular design it selected for this model machine was outweighed by the benefits of that design, it failed to meet its burden of proof. (See the Use Note to BAJI No. 9.00.5 (7th ed. 1986).) Of course, had it sought to do so its efforts might well have proven successful for one can readily postulate potential economic, aesthetic and engineering reasons for the design selected. Nonetheless, in the complete absence of any evidence regarding such "beneficial" considerations, the jury's verdict was both understandable and proper.

In fact, and rather ironically, the jury still found in plaintiff's favor even though Honda's counsel was able to convince the trial court, over plaintiff's stout and correct objections, to insert among the issues as to which she bore the burden of proof when proceeding under *Barker* v. *Lull*'s second prong, an issue that properly should arise only under its first prong. As proposed by Honda, and given by the court, this modified instruction read: "In this case, plaintiff seeks to establish liability on the part of defendant under the theory of design defect. [¶] A. On a design defect theory, the plaintiff has the burden of establishing by a preponderance of the evidence all of the facts necessary to prove the following issues: [¶] 1. Defendant's status as a distributor of the subject vehicle; [¶] 2. *That the product failed to perform as safely as an ordinary consumer of that product would expect*; [¶] 3. That the defect in the design existed at the time the product left defendant's possession; [¶] 4. That the design of the product was a proximate cause of plaintiff's injuries in the accident; [¶] 5. That the product was used in a manner reasonably foreseeable by the defendant; [¶] 6. The nature and extent of plaintiff's injuries and damages. [¶] If plaintiff has met his burden of proof as outlined then the defendant has the burden of establishing, by a preponderance of the evidence, all facts necessary to prove the following issue: [¶] 1. That the benefits of the design of the product as a whole outweigh the risk of danger inherent in such design." (Italics added to reflect the issue improperly inserted.)

■ Such an amalgamated instruction was clearly erroneous under currently prevailing law for it required plaintiff to prove that this particular

model motorcycle had "failed to perform as safely as an ordinary consumer" would have expected (*Barker's* first prong), before she could ask the jury to consider the entirely separate question of whether or not the "risk of danger inherent in the design [Honda had selected] outweigh[ed] its benefits" (*Barker's* second prong). (See Use Note following BAJI No. 9.00.5 (7th ed. 1986).) Of even greater potential risk, this hermaphroditic advisement informed the jury that simply by introducing evidence of its benefits, a manufacturer might escape liability for injuries caused when its product failed to perform as safely as its ordinary user would expect. Of course, this latter danger never arose here since Honda elected to offer no evidence whatsoever regarding their machine's design.

In any event, what Honda may not now be permitted to do is escape the consequences of its own conscious tactical decision by obtaining through this appeal a complete de novo retrial, wherein it may belatedly make the requisite full exposition of its case which, by its actions in the superior court, it deliberately waived.

Since we have determined, as did the trial court who actually heard the evidence and denied Honda's motion for a new trial, that plaintiff met her burden under the risk-benefit test, we need not consider whether or not she also would have prevailed under the consumer expectations test alone.

The judgment is affirmed.

**COMPTON, J.—** I concur in the result solely under the compulsion of language in *Barker* v. *Lull Engineering Co.* (1978) 20 Cal.3d 413 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1]. I must confess, however, that the result makes no practical sense to me. There is a fundamental flaw in the law governing product liability in California—a flaw which I am hopeful will be remedied by our newly constituted Supreme Court.

The flaw is that under the prevailing concept, no consideration is given to the voluntary choice by a plaintiff to use a product which by its very nature is dangerous but highly utilitarian.

There is on the market today a wide variety of products, for example, chainsaws, "weedeaters" and other power tools which when used in their ordinary and expected manner can produce serious injuries. They have exposed blades which, when they strike some object or bind on a particular item, "kick back" and cause injury.

People voluntarily use these items knowing of their danger because they are useful for a particular job. Why should not that voluntary choice be an ingredient in determining liability for an injury resulting from such use?

Here, plaintiff's husband purchased this motorcycle because he apparently liked its design and appearance. He knew full well at the time that the rear wheel was exposed. If that exposure was of importance to him, he could have chosen another brand or purchased some other covering for the wheel.

Further, when plaintiff took her seat on the motorcycle, she knew that her feet were close to the exposed wheel. There was nothing secret about the fact that certain actions by herself or others could cause her foot to strike the wheel. Plaintiff accepted the configuration of the motorcycle and voluntarily elected to ride with her feet in that precarious position. Her foot was forced into the wheel by the negligence of another driver. Thus, the true cause of the injury was the combination of that driver's negligence and the plaintiff's position on the motorcycle.

Under these circumstances, why should the manufacturer of a popular and mechanically sound product be forced to justify its failure to install the various items, the existence of which Justice Gates says "is a matter of general knowledge and their potential effectiveness in preventing the sort of accident which occurred here is patent." Their absence was as patent to the plaintiff as to anybody else.

As I see it, if a manufacturer does everything necessary to make the machine function properly for the purpose for which it is designed, if the machine is without any latent defect, and if its functioning creates no danger or peril that is not known to the user, then the manufacturer has satisfied what the law ought to demand.

The concept of "socializing" the loss, which is at the heart of the present approach to product liability, is plainly and simply wrong. Unfortunately, as an intermediate appellate court, we are stuck with it. For this reason alone I concur in the result.

**ROTH, P. J.**—I respectfully dissent. The thrust of plaintiff's case is that defendant Honda, the distributor of the motorcycle, is strictly liable[1] to her based on her contention that the unenclosed spoked rear wheel of the motorcycle upon which she was a passenger was defectively designed (discussed *infra*). Her complete prima facie case consisted of evidence showing how the accident occurred (the injury to her leg) and the amputation of a portion thereof. Relying upon those bare bone facts and *Barker* v. *Lull* (1978) 20 Cal.3d 413 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1], she convinced the trial court she had completed a prima facie case of Honda's liability so

---

[1]Although plaintiff's complaint had included other theories of liability, she abandoned them immediately before trial commenced and proceeded solely on a theory of strict liability.

that a showing of nonliability had shifted to defendant Honda. Hence, the narrow question before this court, as set forth by the record and fortified by the plaintiff's pretrial tactics, is when in the progress of a strict liability trial, such as the case at bench, does the burden of going forward shift?

*Barker* did not alter the well-settled rule that a defendant may not be ordered to proceed with the defense until after a full prima facie case has been made by the plaintiff. As the *Barker* court stated: "Because most of the evidentiary matters which may be relevant to the determination of the adequacy of a product's design under the 'risk-benefit' standard—e.g., the feasibility and cost of alternative designs—are similar to issues typically presented in a negligent design case and involve technical matters peculiarly within the knowledge of the manufacturer, *we conclude that once the plaintiff makes a prima facie showing that the injury was proximately caused by the product's design,* the burden should appropriately shift to the defendant to prove, in light of the relevant factors, that the product is not defective." (*Barker* v. *Lull Engineering Co., supra,* 20 Cal.3d 413, 431.) (*Italics added.*)[2]

Thus a proper reading of *Barker* demonstrates that it relieves a strict liability plaintiff only of producing in the prima facie case "technical matters peculiarly within the knowledge of the manufacturer." That has always been the rule.

In *Barker,* the plaintiff was injured at a construction site while operating a high-lift loader manufactured by the defendant. The loader was a truck of heavy construction with equipment designed to lift loads of up to 5,000 pounds. Plaintiff, assigned to operate the loader after its regular operator did not report for work, had received only limited instruction on the use of the loader and had used it only a few times. The accident causing plaintiff's injuries occurred while plaintiff was operating the loader on a stiff sloping terrain and was attempting to lift a load of lumber 18 to 20 feet in the air.

As part of plaintiff's case, he presented expert testimony on how the loader could have been designed differently so as to avoid the accident. The expert further testified as to absence of *specific* safety devices which allegedly rendered the loader defective. Other witnesses testified about other *precise* aspects of the loader to establish it was defectively designed (e.g., absence

---

[2]While the majority suggests that BAJI No. 9.00.5, derived from *Barker* v. *Lull, supra,* 20 Cal.3d 413, and its use note, support plaintiff's theory, I do not agree. Neither the text of the instruction nor the comment following it explicitly address the question of whether a plaintiff, in presenting the prima facie case, must produce evidence of a safer alternate design. This is in all likelihood due to the fact that in the reported decisions the plaintiff apparently had presented evidence of alternative designs as part of the prima facie case. In any event, the obligation to do so is the sole thrust of this dissent.

of an automatic locking device, the placement of the leveling lever, and absence of a "park" position on its transmission).

Defendant manufacturer had experts testify as to why plaintiff's particular claims did not establish the existence of a defective design and why some of plaintiff's suggested design modifications would have had no effect or in fact would have increased the potential danger.

Additionally, defendant presented much pertinent lay evidence the loader was not defective.

Hence, *Barker* makes clear that there is no absolute liability merely because a party is injured while using the defendant's product. There must be evidence of the design defect which proximately caused the injuries *and* evidence of how a safer product could have been manufactured. The *Barker* opinion exhaustively discusses the complex problems inherent to the design and use of the loader and analyzes the type of evidence required in a case when a plaintiff litigates for the first time the question of a particular product's defective design.

*Barker is not* authority for the proposition that a res ipsa loquitur recital of bare bone evidence is sufficient to establish a prima facie case in a strict liability action such as the one at bench.[3]

*Barker's* discussion of evidence, preponderance thereof and burden of proof was made in the context of a strict liability trial wherein the plaintiff had fully presented a prima facie case and defendant had responded thereto. The *Barker* court had no reason to state the obvious. The *Barker* opinion asserts: " 'The change in the substantive law as regards the liability of makers of products and other sellers in the marketing chain has been from fault to defect. The *plaintiff is no longer* required to impugn the maker, *but he is required to impugn the product.*' (Keeton, *Product Liability and the Meaning of Defect* (1973) 5 St. Mary's L.J. 30, 33.)

"If a jury in determining liability for a defect in design is instructed only that it should decide whether or not there is 'a defective design,' it may reach to the extreme conclusion that the plaintiff, having suffered injury, should without further showing, recover; on the other hand, it may go to the opposite extreme and conclude that because the product matches the intended design the plaintiff, under no conceivable circumstance, could recover. The

---

[3]In the latter portion of this dissent, I explain my view that judicial acceptance of the manner in which the instant case was tried effectively but erroneously results in applying res ipsa loquitur to a strict liablity action.

submitted definition eschews both extreme and attempts a balanced approach.

"We hold that a trial judge may properly instruct the jury that a product is defective in design (1) if the plaintiff demonstrates that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, or (2) if the plaintiff proves that the product's design proximately caused his injury and the defendant fails to prove, in light of the relevant factors discussed above, that on balance the benefits of the challenged design outweigh the risk of danger inherent in such design." (*Barker* v. *Lull, supra,* 20 Cal.3d at p. 435.) (Italics added.)

Plaintiff's showing at bench is in marked distinction to that made in *Barker.*

Here, plaintiff's evidence showed that while riding with her husband on his motorcycle, something she had done once or twice every week during the prior three years, she was injured following a collision with an automobile which broke her leg and pushed it into the motorcycle's unenclosed rear spinning spoked wire wheel. Plaintiff offered no evidence of similar prior accidents. Quite apart from the fact plaintiff presented no evidence as to what she or anyone else reasonably expected in regard to the safety of a motorcycle involved in a collision with a car, plaintiff offered no evidence, through either lay or expert testimony, on the significant question of safer alternative designs in regard to the unenclosed rear spoked wheel. Plaintiff attempted to elicit testimony from one of her medical witnesses as to how the motorcycle might have been modified so as to prevent the injury but was precluded from doing such because she was unable to lay a sufficient foundation for the witness's expertise on the question. Plaintiff's counsel, however, argued to the jury, over defendant's objection, about modifications to the motorcycle which might have prevented plaintiff's injuries. He pointed to items such as saddlebags, luggage racks, and fairings as examples of what could have been placed upon the rear wheel area of the motorcycle to enclose it. This argument was improper as there was no legally acceptable evidence in the record to support it (see, e.g., *Malkasian* v. *Irwin* (1964) 61 Cal.2d 738, 745-747 [40 Cal.Rptr. 78, 394 P.2d 822]) and arguably those proposed designs might just as probably been design defects which could have caused more problems.

The naked facts before this court graphically illustrate why a plaintiff is required in its prima facie case to produce some evidence on a safer alternate design before a defendant is required to respond.

As Professor Schwartz has noted: "The heart of the problem is this: one simply cannot talk meaningfully about a risk-benefit defect in a product

design until and unless one has identified some design alternative (including any design omission) that can serve as the basis for a risk-benefit analysis." (G. Schwartz, *Foreward: Understanding Products Liability* (1979) 67 Cal.L.Rev. 435, 468 and see also pp. 470-471.)

In my opinion, *Barker* holds, and common sense and pragmatic fairness dictate, that a plaintiff must set forth, through legally competent evidence, one or more proposed alternatives to the attacked design. (Accord: Cotchett & Cartwright, Cal. Products Liability Actions (1985) § 7.02[1], p. 7-12.1.) Given that, defendant does have something tangible to rebut and is able to show plaintiff's proposals would either entail unreasonable cost, be practically unfeasible, interfere with the product's performance, or create (other) increased risks. (*Barker* v. *Lull, supra,* 20 Cal.3d at pp. 431-432.) Following such a presentation by defendant, the trier of fact can then meaningfully engage in the balancing process known as the risk-benefit analysis to decide whether or not the product was defectively designed.

Absent such an approach, the defendant becomes an absolute insurer of the product. But strict liability has never been and is not now absolute liability. On the contrary, the plaintiff's injury must have been caused by a *defect* in the product. (Traynor, *The Ways and Meanings of Defective Products and Strict Liability* (1965) 32 Tenn.L.Rev. 363, 366-367.)

Dean Prosser, the true king of torts, has noted there is no strict liability when the product is fit to be sold and it is reasonably safe for its intended use but has inherent dangers that no human skill or knowledge has yet been able to eliminate. (Prosser, *The Fall of the Citadel* (*Strict Liability to the Consumer*) (1966) 50 Minn.L.Rev. 791, 812.)

The rationale for requiring plaintiff to demonstrate alternative designs for the product which the party claims was defectively manufactured is as follows: "Requiring an injured plaintiff who seeks damages against a manufacturer on the basis of strict liability in tort for a defective design to show that alternative designs for the product could reasonably have been developed does not enlarge plaintiff's burden of proof. *An injured plaintiff has always had the burden to prove the existence of the defect. The reasonableness of alternative designs, where a design defect is claimed, is part of that burden.* [Citations.] *Strict liability in tort is not a doctrine which places upon the producer absolute liability for all injuries which result from the use of the product*; rather, the purpose of strict liability 'is to insure that the cost of injuries resulting from defective products are borne by the [commercial entities] that put such products on the market rather than by the injured persons who are powerless to protect themselves.' (*Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 63 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d

1049].) Therefore, it [is] proper for the court to define 'defect' in such a way as to place the burden upon the injured plaintiff of establishing that reasonable alternative designs are possible." (*Baker* v. *Chrysler Corp.* (1976) 55 Cal.App.3d 710, 716 [127 Cal.Rptr. 745] [hg. den.], italics added.)

A decision from this division (*Garcia* v. *Joseph Vince Co.* (1978) 84 Cal.App.3d 868, 879, fn. 3 [148 Cal.Rptr. 843] [hg. den.]) holds that *Barker* v. *Lull, supra,* 20 Cal.3d 413, did not alter the requirement that a plaintiff, as part of its prima facie case, must demonstrate ". . . the availability of reasonable alternate design, but simply shifted to defendant the burden of proving the unreasonableness of requiring an alternative in terms of such items as cost of producing the alternative product."

The pragmatic effect of the manner in which the present case was tried amounts to an inappropriate interjection into a strict liability lawsuit of the concept of res ipsa loquitur. Res ipsa loquitur is a venerable concept of negligence law upon which a plaintiff may rely to prove a breach of a duty of due care. Its elements are: (1) the accident must be of a kind which ordinarily would not have occurred in the absence of negligence; (2) the accident was caused by a product formerly in the exclusive control of the defendant and upon which the plaintiff has not made any changes; and (3) the accident must not have been due to any act on plaintiff's part. The evidentiary effect of plaintiff's proof of these three criteria is to shift to the defendant the burden of producing evidence to show it was not negligent. Absent such proof by the defendant, the trier of fact must assume the existence of the defendant's presumed negligence. (Cal. Law Revision Com. com., Deering's Ann. Evid. Code, § 646 (1986 ed.) p. 290.)

It is well settled that res ipsa loquitur has no application to an action based solely upon a theory of strict liability in tort. (*Barrett* v. *Atlas Powder Co.* (1978) 86 Cal.App.3d 560, 565 [150 Cal.Rptr. 339]; *Lewis* v. *American Hoist & Derrick Co.* (1971) 20 Cal.App.3d 570, 579-580 [97 Cal.Rptr. 798].) As this Division has noted, to apply res ipsa loquitur in a strict liability lawsuit would have the effect of making the defendant an absolute insurer unless it could produce satisfactory evidence that there was no defect or that if there were, it was not the proximate cause of the injuries. (*Tresham* v. *Ford Motor Co.* (1969) 275 Cal.App.2d 403, 407 [79 Cal.Rptr. 883] [hg. den.].)

Prophetically, one commentator noted this possibility over 20 years ago when he predicted res ipsa loquitur would be indirectly used to "prove" a product was defective. He warned: "If this practice grows, plaintiff may next be required only to connect up the injury with the product. He may not have to prove a defect. When and if this happens we shall have taken another step on the road toward making consumer's injuries into an equilibrium system,

wherein the important question is not who *caused* the injury, but how should the harm be repaired." (Cowan, *Some Policy Bases of Products Liability* (1965) 17 Stan.L.Rev. 1077, 1094, italics added.)

The critical vice of the trial court's approach is to encourage lawsuits in which plaintiff's counsel alleges only two facts: (1) an accident occurred; and (2) the plaintiff was injured thereby. Instead of doing the requisite investigation, including the gathering of expert testimony, to prove a defendant's product was defective and that the product could have been more safely designed, a plaintiff, such as respondent herein, only establishes the twin facts of an accident and injuries. The consequent burden placed upon the judicial system and the tax-paying public which supports it is immense not to mention the dislocation it creates for all the parties plaintiff names in the action.

Exploding products liability litigation has created a fiscal crisis, fueled in part by such cases as this one where the effect of the jury's decision is to make any defendant, and especially deep pocket defendants, absolute and complete insurers for all injuries resulting from the use of their products even when a plaintiff has utterly failed to establish a design defect. At bench, clearly the driver of the car which hit the motorcycle was potentially culpable. Although served with plaintiff's complaint, he did not answer and pursuant to the parties' stipulation, a default was entered against him. Satisfying any judgment in part and/or in full against him would be futile. And although Honda cross-complained against plaintiff's husband for indemnification based upon a claim he had been negligent in his driving of the motorcycle, the court concluded otherwise in a bench trial conducted after plaintiff's trial had been completed. Hence, defendant Honda, the deep pocket defendant and the distributor of the motorcycle, is left holding the bag although, as Justice Compton cogently notes in his concurring opinion: "The true cause of the injury was the combination of [the automobile] driver's negligence and the plaintiff's position on the motorcycle."

I agree with Justice Compton that in an ill-fated attempt to socialize the loss, the courts have expanded the concept of tort law and financial responsibility of any who may be embraced in the tort charged. I also agree that the original concept of strict liability is Gibraltar solid. However, socialization of the loss is not nor is the doctrine of strict liability the issue in this case. The fundamental question in this case is *due process* in a strict liability case. Acceptance of the trial court's appoach eliminates due process. It permits any injured user of any product, including those mentioned in Justice Compton's concurring opinion, to sue a solvent defendant in strict liability merely by alleging purchase of the product and the sustaining of injuries while using the product. That result corrodes the rule of law as accepted since

adversary trials have been an integral part of the administration of justice and substitutes an ad hoc judicial dispensation of justice. Such a judicial outlook undermines the concept of personal responsibility and the duty to exercise due care. Lack of legal necessity to personally use due care has reached the point at which the effort of a plaintiff to establish the liability of some conceivably solvent potential defendant corrodes the primary instinct of survival.

In brief, I suggest with humility the public is rapidly reaching the cross-roads which present it with a choice between constitutional government as we have lived it or government by 50 judicial oligarchies.

The present judgment is in my opinion against the law in its present state of generous interpretation. I would reverse.

The petition of defendant and appellant for review by the Supreme Court was denied May 21, 1987.