[Civ. No. 69551. Second Dist., Div. Six. Jan. 15, 1985.]

UNITED PACIFIC INSURANCE COMPANY et al.,
Plaintiffs and Appellants, v.
SOUTHERN CALIFORNIA EDISON COMPANY,
Defendant, Cross-complainant and Appellant;
GENERAL TELEPHONE COMPANY OF CALIFORNIA,
Defendant, Cross-defendant and Respondent.

[No. B001532. Second Dist., Div. Six. Jan. 15, 1985.]

FIREMAN'S FUND INSURANCE COMPANY et al.,
Plaintiffs and Appellants, v.
SOUTHERN CALIFORNIA EDISON COMPANY,
Defendant and Respondent.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to rule 976.1 of the California Rules of Court this opinion is certified for partial publication with the exception of points IV and V.

702

## COUNSEL

James O. White, Paul C. Nyquist, Cummins & White, R. Dayton Call, David W. Magnusson, Haws, Record & Williford, Christopher J. Zajic, Zajic & Edwards, Hast & Sabatasse and Richard Kahanowitch for Plaintiffs and Appellants.

F. Leonard Sisk, William G. Tucker, Leslie A. Sheehan, Tucker & Johnston, O'Melveny & Myers, Warren Christopher, James W. Colbert III and Charles C. Lipland for Defendant, Cross-complainant and Appellant and Defendant and Respondent.

John P. McNicholas and Morgan, Wenzel & McNicholas for Defendant, Cross-defendant and Respondent.

## OPINION

**WILLARD, J.**[*]—This litigation results from a disastrous fire in the Sycamore Canyon area of Santa Barbara on July 26, 1977. Approximately 200 homes were destroyed and a number of people were injured. Appellants are homeowners and insurance companies subrogated to the rights of the homeowners. Southern California Edison Company hereafter is identified as Edison. Numerous actions were consolidated for trial and the issue of liability tried first over a period of 25 trial days. Over objection by appellants, causes of action alleging liability for defective products were not submitted to the jury.[1] On the issue of liability for negligence the jury returned a general verdict in favor of Edison. Appellants' motion for a new trial was denied. The appeal is from the judgment entered in favor of Edison. Edison also appeals from a pretrial summary judgment in favor of General Telephone Company of California on Edison's contingent cross-complaint for indemnity.

### ISSUES

The two appeals question six rulings of the trial court:

1. That a claim based on liability for a defective product was not viable.[2]

---

[*]Assigned by the Chairperson of the Judicial Council.

[1]In some cases demurrers were sustained. In others a nonsuit was granted.

[2]Appellants have not contended, either at trial or on appeal, that the rule of strict liability without fault for ultrahazardous activity, as first enunciated in *Rylands* v. *Fletcher,* 3 H.L. 330, should apply. (Cf. *Green* v. *Gen'l. Petroleum Corp.* (1928) 205 Cal. 328 [270 P. 952, 60 A.L.R. 475].)

2. Giving an instruction in the form of BAJI No. 3.79 on intervening cause.

3. Permitting evidence of the content of Public Utilities Commission General Order 95 and Edison's nonviolation thereof, together with instructing the jury to give consideration thereto.

4. Sustaining objection to the receipt of many items in an Edison report on circuit interruptions in the line in question from various causes not shown to be similar to the cause of the accident in this case.

5. Sustaining objection to the receipt in evidence of a magazine article published in 1941 on the hazard of flying kites in proximity to electric transmission lines.

6. Granting a summary judgment in favor of cross-defendant on Edison's claim for contingent indemnity.

We hold that the products liability doctrine established in *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049] is inapplicable to facilities owned and used by a public utility for the transmission of electric energy, and that the trial court made no prejudicial error in its rulings and instructions. We affirm the judgment on the complaints. This renders moot the appeal by Edison on the summary judgment in favor of General Telephone on the cross-complaint.

FACTUAL BACKGROUND

On July 26, 1977 Scott Sheldon was flying a large kite tethered with a 150-pound test nylon line wrapped around a hand-held spool. The kite, string, and spool got away from him in a gusting wind and approached utility lines strung from poles. Near the top of the poles horizontal cross arms supported three conductors owned by Edison and comprising an alternating current electric circuit energized at 16,000 volts. The circuit transmitted current to transformers and other equipment that reduced voltage to a consumer-usable range. Below these electric conductors was a telephone cable owned by General Telephone. The kite string contacted one of the electric conductors and became entangled with the cable. The wind pulled the kite; the kite pulled the string; the string pulled an outer conductor toward the middle conductor, so close that an arc of electric current occurred; the arc caused emission of molten aluminum from the conductor or

conductors; and the molten aluminum ignited brush and grass, resulting in the disastrous fire.

Plaintiffs produced evidence that with the sag that existed in the conductors between poles, a lateral pressure of 21 pounds would have pulled the two conductors together. Their expert also testified that an alternative design configuration for the conductors, by which the middle conductor was attached to the top of the poles instead of being offset to one side, would have required a lateral pressure of 110 pounds to bring the conductors together, assuming the same sag. This alternative configuration was shown in an Edison manual, and the cost of its construction would not have substantially exceeded the cost of the actual construction. Had the alternate configuration been used, the arcing would not have occurred. The gist of the claimed defect in the Edison facilities is that the combination of closeness of conductors and sag between poles permitted arcing that reasonably could have been avoided. Other facts material to the appeal will be stated in connection with discussion of the issues.

I

The issue as to whether the products liability doctrine is applicable to facilities used by a public utility for the transmission of electricity energy appears to be one of first impression in California.[3] *Greenman* v. *Yuba Power Products, Inc.* stated the rule as follows: "A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." (*Greenman* v. *Yuba Power Products, Inc.*, *supra*, 59 Cal.2d 57, 62.) The rule has been extended to protect innocent bystanders. (*Elmore* v. *American Motors Corp.* (1969) 70 Cal.2d 578 [75 Cal.Rptr. 652, 451 P.2d 84, 33 A.L.R.3d 406].) It applies not only to manufacturers and sellers, but also to lessors who place defective products on the market. (*Price* v. *Shell Oil Co.* (1970) 2 Cal.3d 245 [85 Cal.Rptr. 178, 466 P.2d 722].) The doctrine's purpose "is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves." (*Greenman* v. *Yuba Power Products, Inc.*, *supra*, 59 Cal.2d 57, 63.)

The issue as to whether this doctrine should apply to defective electric transmission lines has been considered by appellate courts in a num-

---

[3]We have found no reported California appellate court decision directly in point, and none has been cited by counsel.

ber of other states. Uniformly they have held the doctrine to be inapplicable. (*Petroski* v. *Northern Indiana Pub. Service Co.* (1976) 171 Ind.App. 14 [354 N.E.2d 736]; *Wood* v. *Public Service Company of New Hampshire* (1974) 114 N.H. 182 [317 A.2d 576]; *Farina* v. *Niagara Mohawk Power Corp.* (1981) 81 App.Div.2d 700 438 N.Y.S.2d 645; *Wirth* v. *Mayrath Industries, Inc.* (N.D. 1979) 278 N.W.2d 789; *Erwin* v. *Guadalupe Valley Electric Co-Op* (Tex.Civ.App. 1974) 505 S.W.2d 353; *Kemp* v. *Wisconsin Electric Power Co.* (1969) 44 Wis.2d 571 [172 N.W.2d 161].)

The reasons given for these decisions are summarized as follows: "[E]llectricity is not in a marketable state and the doctrine was not intended to apply in such cases (*Genaust* v. *Illinois Power Co.* 62 Ill. 2d 456, 343 N.E.2d 465); claimed defects in the cable carrying the electrical current are insufficient to establish liability because the cable is not 'packaging' for the current, is not sold to the consumer, and remains owned by and under the control of the utility (*Cratsley* v. *Commonwealth Edison Co.*, 38 Ill.App. 3d 55, 347 N.E.2d 496); until actually delivered, the electricity has not been placed in the 'stream of commerce' (*Petroski* v. *Northern Indiana Public Service Co.* 354 N.E.2d 736 [Ind.]); a defect in the manufacture of the electricity or in the manufacture or design of the wire itself, not merely its location, must be shown (*Erwin* v. *Guadalupe Valley Electric Co-op.*, 505 S.W.2d 353 [Tex.]). Furthermore, throughout the discussions in the commentaries and cases dealing with the claims of those who have been injured through contact with electrical lines, there is the implicit suggestion that electricity, 'a subtle agency that pervades all space and evades successful definition . . .' (Ballantine's Law Dictionary), is not a product within the contemplation of the doctrine's authors." (*Farina* v. *Niagara Mohawk Power Corp.*, *supra*, 438 N.Y.S.2d 645, 646, 647.)

As noted above, the California Supreme Court in *Greenman* stated that the product liability occurred when an article is placed on the market. (*Greenman* v. *Yuba Power Products, Inc.*, *supra*, 59 Cal.2d 57, 62.) In *Price* v. *Shell Oil Co.* the court compares this to the similar concept of putting a product "in the stream of commerce," as that phrase is used in *Cintrone* v. *Hertz Truck Leasing, etc.* (1965) 45 N.J. 434 [212 A.2d 769]. (*Price* v. *Shell Oil Co.*, *supra*, 2 Cal.3d 245, 254.) Several of the cases from sister states, cited above, point out that high voltage electric transmission facilities are not placed in the stream of commerce, but, on the contrary, are retained in the ownership and control of the electricity supplier and used solely by it to transmit electricity to other facilities for reduction of voltage and ultimate delivery to meet the demands of consumers. The products liability doctrine does not require a transfer of ownership (*Price* v. *Shell Oil Co.*, *supra*) but it does require that a product be marketed, or

in some manner be placed in the stream of commerce. Here that did not occur.

A somewhat analogous situation was presented in *Shook* v. *Jacuzzi* (1976) 59 Cal.App.3d 978 [129 Cal.Rptr. 496]. There an injured employee sought to recover from his employer for injuries received while operating a defective machine manufactured by the employer for use in its own business. He sought to avoid the rule that the Workers' Compensation Act provided exclusive relief, by basing his claim on the products liability doctrine. (Cf. *Bell* v. *Industrial Vangas, Inc.* (1981) 30 Cal.3d 268 [179 Cal.Rptr. 30, 637 P.2d 266].) In denying his claim the appellate court held that the products liability doctrine did not apply because the employer "did not sell the machine or in any way place it in the stream of commerce." (59 Cal.App.3d 978, 981.) Later decisions adhere to this rule. (*Bonus-Built, Inc.* v. *United Grocers, Ltd.* (1982) 136 Cal.App.3d 429 [186 Cal.Rptr. 357]; *Horney* v. *Guy F. Atkinson Co.* (1983) 140 Cal.App.3d 923 [190 Cal.Rptr. 18].)

Appellants argue that Edison placed the transmission system in the stream of commerce by using the system itself. They point out that the system would have been placed in the stream of commerce had Edison sold it to another, (*Stuart* v. *Crestview Mut. Water Co.* (1973) 34 Cal.App.3d 802 [110 Cal.Rptr. 543]) or leased the system, (*Price* v. *Shell Oil Co., supra,* 2 Cal.3d 245) or licensed the system, (*Garcia* v. *Halsett* (1970) 3 Cal.App.3d 319 [82 Cal.Rptr. 420]) or sold its design patents on the system, (*Kasel* v. *Remington Arms Co.* (1972) 24 Cal.App.3d 711 [101 Cal.Rptr. 314]). But none of those things occurred. This is significant. The concept of marketing—of placing a product in the stream of commerce—necessarily involves transfer of property or some property right. Here there was no transfer whatsoever. Edison simply used its own facilities to transmit its own energy for sale down the line.

This issue requires consideration of a broader question—whether it is appropriate to make a major extension of the products liability doctrine so that it will apply to the facts of this case.[4] Appellants urge three reasons for doing so. First they state that such an extension would spread the risk of loss among all users of the product instead of placing it on a few defenseless victims, citing *Escola* v. *Coca Cola Bottling Co.* (1944) 24 Cal.2d 453, 462 [150 P.2d 436] (conc. opn.), and *Campbell* v. *General Motors Corp.* (1982) 32 Cal.3d 112, 122 [184 Cal.Rptr. 891, 649 P.2d 224, 35 A.L.R.4th 1036]. Here, however, Edison is the only user of the product claimed to be defec-

---

[4]This would substitute for the requirement that a product be placed on the market, the placing of the product in a location where its defect could cause harm.

tive. Assuming that what is meant is that Edison should be held strictly liable for harm caused anyone by defective system facilities, there is a further problem. Edison is a privately owned public utility, subject to governmental regulation. It cannot raise rates without approval of the Public Utility Commission. Its profits are limited to a reasonable return. The company is also subject to review by the P.U.C. as to what expenses it will be allowed to treat as reasonable operating expenses for inclusion in its rates. Imposition of strict liability for defective transmission facilities will not necessarily pass the burden of paying damages from the utility to its customers.

In an inquiry such as this it is also appropriate to consider whether imposition of liability will provide an economic incentive to improve product safety. "The manufacturer is held strictly liable because it 'is in a peculiarly strategic position to promote the safety of [its] products . . . . [T]he pressure of strict liability could scarcely be exerted at a better point if accident prevention is to be furthered by tort law.' " (*Bell* v. *Industrial Vangas, Inc., supra,* 30 Cal.3d 268, 279, quoting James, *General Products—Should Manufacturers Be Liable Without Negligence?* (1957) 24 Tenn.L.Rev. 923.) While this is true with respect to most manufacturers and others who distribute their products, it is less apt as applied to a public utility that is very closely regulated with regard to safety. Public Utilities Commission General Order 95 regulates most facets of an electric utility's overhead transmission line construction and operation. Although, as indicated below, that order did not cover maximum sag in lines, (which is a principal basis of the defect claimed by appellants), the order may be modified to require increased safety precautions. In the case of a regulated public utility there is less need than in the case of an unregulated manufacturer to motivate safety precautions by the economic sanction of strict liability.

Also we consider whether the burden of proving negligence by a public utility is so onerous that strict liability is required to achieve fairness. While this might be the case in some situations, it appears to have little merit with respect to spacing and sagging of 16,000 volt transmission lines. The conductors are in the open, subject to the view of anyone in the area. Appellants had no great difficulty in developing the facts with regard to spacing and sagging. Alternative spacing designs appeared to be within the knowledge of appellants' expert. Strict liability is not required because of any difficulty in obtaining facts.

In summary, we are not prepared to find that the factors which gave rise to the doctrine of strict liability for placing defective products on the market are so strong in this case that they justify a major extension of the doctrine

to high voltage electric transmission lines owned and operated by privately owned public utilities.

## II

In instructing the jury, the trial court gave BAJI No. 3.79, modified to read as follows: "If you find that defendant Southern California Edison Company was negligent and that its negligence was a substantial factor in bringing about an injury to the plaintiff but that the immediate cause of the injury was the negligent conduct of a third person, the defendant is not relieved of liability for such injury if: (1) At the time of his conduct defendant realized or reasonably should have realized that a third person might act as he did; or (2) A reasonable person knowing the situation existing at the time of the conduct of the third person would not have regarded it as highly extraordinary that the third person had so acted; or (3) The conduct of the third person was not extraordinarily negligent and was a normal consequence of the situation created by defendant Southern California Edison Company. As used in this instruction, 'extraordinary' means unforeseeable, unpredictable, statistically extremely improbable." Appellants contend that this was error because it invited the jury to ignore the rule that if the risk of *harm* is foreseeable, even if the *negligent conduct* is not foreseeable, liability for negligence exists. They rely principally on *Pappert* v. *San Diego Gas & Electric Co.* (1982) 137 Cal.App.3d 205 [186 Cal.Rptr. 847]. In that case the instructions were held to be prejudicially erroneous. They included two which read: "If you find that the conduct of Charles Pappert was a superseding cause of his death, you must find that the conduct of the defendant and the cross-defendant was not the legal cause of plaintiff's injuries. The general test of whether an act which operates to produce an injury breaks a chain of causation is the foreseeability of the act. The precise intervening act need not be foreseeable." The trial court in this case gave no similar instructions. BAJI No. 3.79 is worded solely in the negative. It tells the jury that there is no superseding cause under certain circumstances. It does not state that absent such circumstances superseding cause does exist.

In addition to giving BAJI No. 3.79 as modified, the trial court gave BAJI No. 3.11, modified to read as follows: "One test that is helpful in determining whether or not a person was negligent is to ask and answer whether or not, if a person of ordinary prudence had been in the same situation and possessed of the same knowledge, he would have foreseen or anticipated that someone might have been injured by or as a result of his action or inaction. It is not necessary that the exact consequence which occurred should have been foreseeable; it is enough that a reasonably prudent person

would foresee that injuries of the same general type would be likely to occur in the absence of adequate safeguards. If the answer to the question is 'yes,' and if the action or inaction reasonably could have been avoided, then not to avoid it would be negligence." The portion of the instruction underlined above was added by the trial court. The insert stated the rule for which appellants contend—that the foreseeability of ultimate harm, not of the specific intervening act, is controlling on the issue of liability.

Justice Kaus, as a Court of Appeal justice, explained the background of the problem of intervening cause as follows: "The problem of intervening negligent conduct has, of course, been considered in a number of California decisions. It would be idle to pretend that all cases are easily reconcilable, but we take it as settled in California today that the principles of causation of the Restatement of Torts, at least as they relate to intervening and superseding causes, have been declared to be the law of this state in a number of decisions of our Supreme Court. [Citations.] In *Stewart* v. *Cox, supra,* [55 Cal.2d 857 (13 Cal.Rptr. 521, 362 P.2d 345)] the Supreme Court said: 'The rules set forth in sections 442-453 of the Restatement of Torts for determining whether an intervening act of a third person constitutes a superseding cause which prevents antecedent negligence of the defendant from being a proximate cause of the harm complained of have been accepted in California.' " (*Ewart* v. *Southern Cal. Gas Co.* (1965) 237 Cal.App.2d 163, 170 [46 Cal.Rptr. 631].) Justice Kaus points out that the source of much of the problem in the analysis of intervening causes is the fact that leading authorities, including Justice Traynor and the Restatement, believe that in reality the problem of intervening cause is not a question of causation, but rather a question of duty. The Restatement comments as follows: "The problem which is involved in determining whether a particular intervening force is or is not a superseding cause of harm is in reality a problem of determining whether the intervention of the force was within the scope of the reasons imposing the duty upon the actor to refrain from negligent conduct. If the duty is designed, in part, at least, to protect the other from the hazard of being harmed by the intervening force, or by the effect of the intervening force operating on the condition created by the negligent conduct, then that hazard is within the duty, and the intervening force is not a superseding cause. (See Section 443-452.) A completely accurate analysis of the hazard element in negligence would require the material on superseding cause in Chapter 16 to be placed in this chapter. However, in the past, the courts generally have discussed the effect of intervening forces in terms of causation. The solution of the problem of determining whether the presence of an intervening force should relieve the actor from liability for harm which his conduct was a substantial factor in bringing about (see Section 440) is facilitated by an appreciation of the fact that the problem is a 'hazard

problem' rather than a problem of causation.'' In view of the interrelation between the duty and causation aspects of the problem of intervening acts, it was not prejudicial error, if error at all, for the trial court to state the rule of foreseeability of harm within an instruction on negligence as opposed to one on causation.

Appellants also contend that BAJI No. 3.79 invites exoneration where another person is extraordinarily negligent. But the language of 3.79 is in the negative. It merely describes certain situations in which intervening cause shall not be found to exist. In *Campodonico* v. *State Auto Parks, Inc.* (1970) 10 Cal.App.3d 803, 807 [89 Cal.Rptr. 270] a reference to extraordinary negligence was criticized because of the ambiguity of the term. Here the court added to 3.79 a definition of "extraordinary" along the lines suggested to be free from error in *Campodonico*. We find no error.

■ Jury instructions are to be considered in their entirety. If, when so considered, they state the law of the case fairly and clearly, they present no reversible error even though isolated passages may be amenable to criticism. (*Gordon* v. *Aztec Brewing Co.* (1949) 33 Cal.2d 514, 519 [203 P.2d 522]; *Cucamonga Co. Water Dist.* v. *Southwest Water Co.* (1971) 22 Cal.App.3d 245, 249, 266 [99 Cal.Rptr. 557]; *Eagar* v. *McDonnell Douglas Corp.* (1973) 32 Cal.App.3d 116, 120 [107 Cal.Rptr. 819].) ■ We conclude that the instructions on negligence and causation considered in their entirety, were not prejudicial.

### III

■ Prior to jury selection appellants made a motion in limine for exclusion of evidence of Public Utilities Commission General Order 95 and evidence of compliance therewith by Edison. This order, as indicated above, set minimum safety standards for electric transmission lines. Appellants indicated that they were not contending that Edison violated the order and thereby were negligent as a matter of law. The trial court stated that compliance with the order would not relieve Edison of responsibility, but that such evidence, if offered, would be received to show conformity with custom and practice in the industry, which in turn would be relevant to the issue of due care. Thereafter, appellants in their opening statement to the jury discussed the general order and later introduced evidence to show that it had not been violated. Edison also introduced evidence to show nonviolation. The court instructed the jury as follows: "Evidence as to whether or not a person conformed with general orders of the Public Utilities Commission or with a custom that had grown up in a given locality or business is relevant and ought to be considered, but is not in and of itself controlling

on the question of whether or not he exercised ordinary care, for that question must be determined by the standard of care I have stated to you."

Appellants contend that evidence regarding general order 95 was irrelevant and prejudicial. Violation of a statute or safety order creates a presumption of negligence (Evid. Code, § 669), but here there was no violation. ■ Likewise, compliance with a statute or safety order does not conclusively establish freedom from negligence. (*Lozano* v. *Pacific Gas & Elec. Co.* (1945) 70 Cal.App.2d 415, 424 [161 P.2d 74]; *Nevis* v. *Pacific Gas & Elec. Co.* (1954) 43 Cal.2d 626, 630 [275 P.2d 761].) ■ The issue is whether lack of violation of a safety order is any evidence of due care. A number of cases mention this factor,[5] but we have found no California decision directly in point.

■ Edison points to the established rule that evidence of custom and practice is admissible on the issue of due care. (*Perumean* v. *Wills* (1937) 8 Cal.2d 578, 583 [67 P.2d 96]; *Bullis* v. *Security Pacific National Bank* (1978) 21 Cal.3d 801, 809 [148 Cal.Rptr. 22, 582 P.2d 109, 7 A.L.R.4th 642]; see 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 498, pp. 2764-2765.) ■ From this, Edison argues that general order 95 is as relevant as custom and also that it tends to prove custom in the regulated industry. In this case, however, the general order does not directly address the defects appellants claim were inherent in the design of the transmission facilities, to wit, that the lines were too close together for their amount of sag, or, stated conversely, had too much sag for their closeness in spacing. It follows that there was neither violation nor compliance with the safety order in this regard. In this circumstance evidence regarding the order did not tend to prove or disprove that respondent used due care. It was irrelevant and inadmissible.

■ The California Constitution in article VI, section 13 and the Evidence Code section 353 provide that a judgment shall not be reversed by reason of the erroneous admission of evidence unless its admission resulted in a miscarriage of justice. "A miscarriage of justice should be declared only when the reviewing court is convinced after an examination of the entire case, including the evidence, that it is reasonably probable a result more favorable to the appellant would have been reached absent the error." (*Brokopp* v. *Ford Motor Co.* (1977) 71 Cal.App.3d 841, 853 [139 Cal.Rptr. 888, 93 A.L.R.3d 537].) ■ Appellants argue that the error was com-

---

[5]E.g., *Nevis* v. *Pacific Gas & Elec. Co., supra,* 43 Cal.2d 626, 630; *Perrine* v. *Pacific Gas & Elec. Co.* (1960) 186 Cal.App.2d 442, 448 [9 Cal.Rptr. 45]; *Hogue* v. *Southern Pacific Co.* (1969) 1 Cal.3d 253, 258 [81 Cal.Rptr. 765, 460 P.2d 965].

pounded because the court instructed the jury to consider the evidence. But, as indicated above, the evidence was essentially meaningless. We have reviewed the entire case and are not convinced that the general order evidence affected the outcome. It is not reasonably probable that appellants would have prevailed if the general order had not been mentioned. The error in admitting the irrelevant evidence was not prejudicial and does not justify a reversal of the judgment.

From this point forward the balance of this opinion is not certified for publication as stated on page 700, *ante.*

The judgment is affirmed.

Stone, P. J., and Abbe, J., concurred.

The petition of plaintiffs and appellants for a hearing by the Supreme Court was denied April 25, 1985. Kaus, J., did not participate therein. Mosk, J., was of the opinion that the petition should be granted.