[No. A080058. First Dist., Div. Four. July 13, 1998.]

AETNA CASUALTY & SURETY CO., Plaintiff and Respondent, v.
FARMERS BROTHERS CO. et al., Defendants and Appellants.

BRASS DOOR, INC., Plaintiff and Respondent, v.
FARMERS BROTHERS CO. et al., Defendants and Appellants.

**COUNSEL**

Bien & Summer, Elliot L. Bien, Cesari, Werner & Moriarty and Dennis F. Moriarty for Defendants and Appellants.

John E. Lautemann, Westover & Westover and William H. Westover for Plaintiffs and Respondents.

## OPINION

**REARDON, J.**—This is an appeal from a judgment in favor of respondents Brass Door, Inc. (Brass Door), and its insurer Aetna Casualty & Surety Co. (Aetna) in their product liability action against Farmers Brothers Co. and Brewmatic, Inc. (collectively, Farmers). Farmers' only contention on appeal is that respondents failed to establish an objective feature of the coffee maker in question—namely, the heating capacity of the high-heat element alleged to have started the fire at Brass Door. We conclude respondents met their burden and therefore affirm the judgment.

## I. FACTS

Early Sunday morning, April 14, 1994, a fire broke out at the Brass Door restaurant in San Ramon, damaging the building. Nancy Schlesinger and Danny Basso, co-owners of the restaurant, spent $850,000 on debris removal and reconstruction. Aetna provided $560,000 under various insurance policies.

Brass Door was equipped with a coffee maker unit manufactured, installed and maintained by Farmers; the restaurant had no responsibility for its installation or maintenance. Farmers supplied Brass Door with glass coffee pots with plastic handles. A Farmers' employee had worked on the machine the Thursday before the fire.

Bartender Michael Dickerson closed the restaurant Saturday night and, as usual, turned the coffee maker knob to the off position, leaving it plugged in.

Assigned to investigate the fire for the San Ramon Fire Department was Fire Inspector Geoffrey Aus. After conducting a 10-hour investigation, he concluded that the origin of the fire was in the area of the coffeemaker.

Donald Perkins, hired by Aetna to determine the cause and origin of the fire, concurred. A number of factors contributed to his opinion: First, the coffee station area sustained the greatest fire damage. Further, the burn patterns, method of fighting the fire, the ventilation of the fire and failure rate of windows and skylights all pointed to the coffee maker area as the point of origin. Perkins then identified several heat sources: the coffee

maker, an electrical outlet and the conduit that went to it, a wall switch and the service cord to the coffee maker. He eliminated all sources of heat except the coffee maker, leading to the conclusion that "the cause of this fire was from an undetermined malfunction or failure within the coffeemaker [*sic*] spreading the fire out from that point." As to the fuel source, Perkins found some plastic embedded in the top burner area and indicated the fire spread from that point up.

Alfred Silvestri, another fire investigator retained by the insurer, confirmed Perkins's findings. He also eliminated all heat sources except the coffee maker and determined that the area of the coffeemaker was the area of origin.

Respondents also retained Douglas Bennett, an electrical engineer, to examine the coffee maker for any defects. He observed that there was a light-brown resolidified residue on the high-heat element that was not present anywhere else. This substance was liquid and viscous and had flowed down the high-heat element and pan, leaking into the bottom of the appliance. Testing revealed that the material was of the same composition as the handle of Farmers' coffee urns. Bennett additionally found that although externally the knob was in the vertical "off" position, internally the back of the switch had moved so the coffee maker was actually in "low" position. Further, "internally on the night of the fire the mechanism did not turn off or regulate the temperature at a low setting, but allowed essentially the element to remain on and in a constantly on or what might be referred to as a 'thermal runaway condition.'" Bennett explained that the design of the switch installation was defective because there was no "detent" or notch that would have prevented the body of the switch from rotating within its opening. Moreover, there was no pilot light to show whether the heat element was on or off.

Bennett further testified that his tests to determine the wattage of the high-heat element did not exactly match a 500- or 400-watt specification: "It was closer to 500 watts, but it was in between the two. . . ." He then asked Farmers for an exemplar high-heat element. According to Bennett, he "was told by the manufacturer and given a 500-watt element and told that it was an exemplar." Bennett determined from reviewing testimony "of the manufacturer's person most knowledgeable concerning the operation of this machine[1] and testing performed by Mr. Zaminski [*sic*] that the high-heat element had in their tests actually caused ignition of dripping plastic from

---

[1]This person was Warand Kirsch, engineering manager for Farmers. Farmers' counsel mentioned in opening statement that Kirsch would testify on the company's behalf "as to the

one of the handles." That element reached temperatures in the neighborhood of 900 degrees Fahrenheit. Bennett offered that there was no good reason for the heat element to get that hot.

Appellants brought forth one expert, Gerald Zamiski, whose specialty was metallurgical engineering. Zamiski testified that plastic melts at 410 to 420 degrees Fahrenheit. He also stated that the actual unit from Brass Door was a 400-watt unit, based on his tests. With a 400-watt element, an empty decanter and the switch on high, his tests indicated that the maximum plastic temperature was 312 degrees.

The jury returned a verdict for the plaintiffs on both the product liability and negligence causes of action. Judgment was entered in plaintiffs' favor in the amount of $1,682,067.86. This judgment was later augmented by an additional $54,452.54 in Aetna's favor, plus prejudgment interest. Defendants in turn moved for a new trial and for judgment notwithstanding the verdict, which motions the trial court denied. This appeal followed.

## II. Discussion

■ Farmers' sole contention is that respondents did not meet their minimal foundation burden of establishing the heating capacity of the high-heat element. Their theory proceeds as follows: Respondents' expert, Electrical Engineer Bennett, could not pin down the exact wattage of the high-heat element of the actual coffee maker. On the other hand, Farmers' expert did ascertain the wattage and conducted tests which proved the heater was not powerful enough to melt or ignite the plastic handle of the decanter. With the failure of the foundational element of the wattage and heating capacity of the high-heat element, the verdict cannot stand.

■ A manufacturer is strictly liable for resulting injuries where the product fails to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner. (*Barker* v. *Lull Engineering Co.* (1978) 20 Cal.3d 413, 419-420 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1].) To establish a prima facie case of design defect under this test for a product defective in design, plaintiff must bring forth evidence of "(1) his or her use of the product; (2) the circumstances surrounding the injury; and (3) the objective features of the product which are relevant to an evaluation of its safety." (*Campbell* v. *General Motors Corp.* (1982) 32 Cal.3d 112, 127 [184 Cal.Rptr. 891, 649 P.2d 224, 35 A.L.R.4th 1036].)

design of this coffee service." Indeed, Kirsch was present at the defense table during part of the trial, but Farmers did not call on him to testify.

California law also recognizes that proof of defect and proximate cause by direct evidence frequently is impossible and, thus, a plaintiff may satisfy his or her burden by circumstantial evidence. (*Id.* at p. 123.)

And, where plaintiff intends to adduce evidence of the functioning of related products to prove that the product in question was defective, identical conditions need not be present between the two systems. Substantial similarity normally is sufficient. (See *Hasson* v. *Ford Motor Co.* (1982) 32 Cal.3d 388, 403-404 [185 Cal.Rptr. 654, 650 P.2d 1171].)

■ The uncontroverted evidence established that the origin *and* heat source of the fire was the coffee maker and bartender Dickerson had turned the coffee maker knob to the off position when leaving the night before the early morning fire. Further, there was substantial evidence that the switch mechanism rotated in its housing so that in fact the machine remained energized to the point of being in a "thermal runaway condition." A simple detent or notch would have prevented rotation and installation of a pilot light would have readily informed the operator when the machine was in a false off situation.

According to Bennett's tests, the wattage of the actual coffee maker was closer to 500 watts than 400 watts and indeed Farmers' engineering manager provided an exemplar with a 500-watt, high-heat ring element. As well, plastic had been found embedded in the top burner.

Appellants seem to be arguing that because Bennett's wattage tests did not fall neatly into a 500 or 400 pigeonhole, the jury had to accept Zamiski's testimony that the high-heat element was 400 watts and such wattage could not produce a high enough temperature to melt plastic. There are several flaws with this line of reasoning. First, Bennett's conclusion that the wattage was closer to 500 than 400 was not, as appellants suggest, inconclusive. Rather, it defined a potential range of wattage from 451 to 499 watts. Second, Bennett asked Farmers' engineering manager for an exemplar and was given a 500-watt element. The jury certainly could infer that Farmers was representing that the actual element had this same characteristic. Third, Zamiski was the only one who represented that the actual element was 400 watts, based on his tests, yet he was not an electrical engineer, nor was he a Farmers's employee. Again, the jury was free to reject Zamiski's testimony in favor of Bennett's. Moreover, Bennett testified that the high-heat element could generate temperatures sufficient to start a fire, relying on *two* separate sources: deposition testimony of Kirsch as well as Zamiski's test on the 500-watt appliance. Thus, regardless of Zamiski's opinion concerning the

capacity of a 400-watt element, given that melted plastic appeared on the high-heat element and dripped down into the machine, the jury could also infer that the higher wattage attested to by Bennett was sufficient to heat the element to a point of igniting the coffee urn handle. For all these reasons we conclude that respondents adequately established a prima facie case of design defect, including the foundational factor concerning the heating capacity of the high-heat element.[2]

Farmers complains nonetheless that respondents violated the court's admonition, on Farmers' motion *in limine* concerning the wattage issue, that in order to admit the test results on the 500-watt machine into evidence, respondents had to establish a foundation for "a similarity between the two machines." This respondents did, by Bennett's testimony concerning the wattage range, coupled with provision of the 500-watt exemplar by Farmers.

We affirm the judgment.

Hanlon, P. J., and Poché J., concurred.

A petition for a rehearing was denied August 8, 1998.

___

[2]Unfortunately, the jury did not have the complete picture on the wattage and heat capacity issues because Farmers did not put Kirsch on the stand. Some of the missing picture is supplied by Farmers' request for judicial notice and respondents' opposition thereto. Farmers has asked us to take judicial notice of a portion of Kirsch's deposition wherein he states that the unit was a Brewmatic unit and Brewmatic sells units with a lower wattage than the 500-watt Farmers Brothers Co. unit. In opposition, respondents have presented their exhibit, identified at trial but not admitted into evidence, consisting of a letter from Kirsch wherein he states, relative to a 400-watt ring element, that "a red hot ring element controlled by an Infinite Control Switch set on the 'high' setting will far exceed 400 [degrees Fahrenheit]. It will reach a temperature more like 900 [degrees Fahrenheit] on the top surface." This letter may be the reason Kirsch did not testify, and it appears that although the actual element may have been a 400-watt element, its heating capacity was more than sufficient to ignite the plastic handle of the coffee urn.